IN THE UNITED STATES DISTRCT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LINDSAY TIGHE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. _____ |
| ) | **Jury Trial Demanded** |
| DR. JAMES L. CHAPPUIS ) | |
| and SPINE CENTER ) | |
| ATLANTA, LLC, ) | |
| ) | |
| Defendants. ) | |

**Complaint**

**Introductory Statement**

1. This is a sexual battery, harassment, and discrimination case brought against Dr. James L. Chappuis and Spine Center Atlanta, LLC on behalf of plaintiff Lindsay Tighe, who was harassed because of her sex and faced sexual assault and battery in the workplace.

**Jurisdiction and Venue**

2. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United

1

States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The Court has supplemental jurisdiction over Ms. Tighe's state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the federal question claims.

3. Venue is proper in the Court's Atlanta Division because a substantial part of the events and omissions giving rise to the controversy occurred in that division. *See* 28 U.S.C. § 1391(b)(2).

## Parties

4. Plaintiff Lindsay Tighe is a former employee of Spine Center Atlanta, LLC and a resident of Georgia.

5. Dr. James L. Chappuis is the founder, owner, and senior orthopaedic spine surgeon at Spine Center Atlanta, LLC. Upon information and belief, Dr. Chappuis is a resident of and domiciled in Fulton County, Georgia.

6. Spine Center Atlanta, LLC ("SCA") is a clinic that offers care for orthopedic, extremity, and interventional spine care in the state of Georgia. SCA is led by Dr. James L. Chappuis. SCA is a resident of and domiciled in Fulton County, Georgia.

**Factual Allegations**

7. Lindsay Tighe began her work at SCA under Dr. James L. Chappuis in August of 2018. At the time she was hired, her title was Director of Clinical Operations, which meant working closely on a regular basis with Dr. Chappuis.

8. Despite the medical and professional nature of her work position, Dr. Chappuis required Ms. Tighe and her other female co-workers to "dress up" in short skirts, tight clothing, heels, and makeup as opposed to scrubs for weekly patient "clinic" hours. According to SCA's CEO at the time, this work practice—referred to as "heels and lipstick Wednesdays" by Dr. Chappuis's assistant—was to ensure that Dr. Chappuis was in a "good mood" while seeing patients. SCA management led Ms. Tighe to believe that part of her job was to ensure that Dr. Chappuis was kept happy, which included following such requirements and enduring sexual behavior exhibited by Dr. Chappuis.

9. Beyond the clothing requirements, Dr. Chappuis regularly exhibited sexually aggressive behavior towards his female staff, including Ms. Tighe, such as touching, hugging, and kissing them on

the back of the neck. On multiple occasions, Dr. Chappuis would wear scrubs without underwear and upon becoming aroused, press his erect penis against Ms. Tighe and her female co-workers. He frequently mentioned his Sicilian heritage as "proof" of the size of his penis. Dr. Chappuis also repeatedly stated that he had $1 million for his female employees who would bear him a child.

10. In addition to sexualized conduct directed at them personally, Ms. Tighe and other SCA staff observed Dr. Chappuis engaging with prostitutes during work hours in a house on the clinic's property known as the "Downhood House." Strippers would also be brought into the clinic to entertain Dr. Chappuis.

11. It is against this backdrop that Ms. Tighe was harassed because of her sex and then discriminated and retaliated against for becoming pregnant and having a child. Ms. Tighe suffered multiple unwarranted demotions and indignities that ultimately left her with no option but to resign in March of 2021.

12. Though Ms. Tighe began working at SCA as Director of Clinical Operations, she was later promoted to Director of Business

Development, effective May 6, 2019. In that position, Ms. Tighe interacted with patients, clinical staff, administrative staff, and business colleagues. She had management responsibilities and was eligible for performance-based bonuses, which were a significant factor in her overall compensation. She enjoyed that role and thrived in it.

13. Ms. Tighe learned she was pregnant in the winter of 2019. She tried to keep the news private from Dr. Chappuis, fearing his reaction, though she shared the news with a few close office friends.

14. Later that year, after the news of Ms. Tighe's pregnancy had spread around the office (despite her requests that her friends exercise discretion), Dr. Chappuis began making inappropriate comments regarding the circumstances of Ms. Tighe's pregnancy. Management warned her to do her best to stay out of Dr. Chappuis's sight so as to not upset him.

15. Ms. Tighe eventually formally disclosed her pregnancy to SCA. Almost immediately following the disclosure of her pregnancy to SCA, Ms. Tighe's functional role was shifted from a client-facing and prominent position to an underwriting one. During her maternity

leave, SCA eliminated her position and, upon her return, put her in the made-up role of "Clinical Documentation Improvement Specialist" in the IT department. That position offered no upward mobility, no opportunity for performance-based bonuses, less-qualified supervisors, and constant hourly surveillance; SCA, and Dr. Chappuis, were seeking to punish Ms. Tighe because, as a mother, he no longer viewed her with the same sexual desire.

16.  Ms. Tighe was ordered to work in a physically isolated part of the office on IT matters, despite having little to no technological training or expertise. Instead of managing employees, she was ordered to report to an IT staffer (whom she had formerly managed). She was directed not to work with any other staff members. Whereas she once had professional flexibility regarding her job hours, post-pregnancy Dr. Chappuis required her to be present set hours; she was chastised and ridiculed for being even a few minutes "late."

17.  SCA's Human Resources director told Ms. Tighe that Dr. Chappuis was trying to have her terminated, and so Human Resources needed to "come down hard" on her.

18. Following her maternity leave, Ms. Tighe was forced to sign a document saying she approved her job change as a condition of her return to the office. Ms. Tighe raised concerns about pregnancy discrimination, but the interim Human Resources director, acting at Dr. Chappuis's direction, did not address her concerns.

19. Ultimately, the work environment forced Ms. Tighe to quit, which is the definition of constructive discharge. *See, e.g., Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016).

20. Because SCA created a hostile work environment to serve Dr. Chappuis's sexual desires, Ms. Tighe suffered discrimination, retaliation, and constructive discharge.

21. Ms. Tighe filed a charge with the Equal Employment Opportunity Commission and, on May 24, 2022, the EEOC issued a Notice of Right to Sue, which is attached hereto.

## Causes of Action

22. Ms. Tighe incorporates the foregoing allegations into the following paragraphs as if set forth therein.

### Count 1: Violation of Title VII

23. Ms. Tighe is a woman and a member of a protected group.

24. Ms. Tighe, like other female employees of SCA, was subjected to unwelcome harassment because she was a woman, including unwanted touching, kissing, sexual comments, and requirements to dress in a certain way that was not necessary to the performance of her job.

25. That harassment was severe or pervasive enough to alter the terms and conditions of employment and create a hostile and abusive working environment. Ms. Tighe, along with SCA's other female employees, was aware of the need to keep Dr. Chappuis happy. She was aware that Dr. Chappuis brought prostitutes and strippers onto the premises. Dr. Chappuis touched her in an unwelcome, sexually inappropriate way. She frequently had to cope with Dr. Chappuis's sexually inappropriate jokes and comments, including that he would pay her, or another female employee, $1 million if she would have a baby with him.

26. Dr. Chappuis is ultimately in charge at SCA, and was aware of his own behavior (and that it violated federal law). Other individuals in

management and leadership positions at SCA were aware of Dr. Chappuis's unlawful behavior and did nothing to discourage, prevent, or penalize it, including senior executives who would joke about "the ladies" needing to "dress up" for clinic to keep Dr. Chappuis happy. Instead of stopping him, some SCA leaders facilitated Dr. Chappuis's misconduct. When one SCA manager refused to cooperate with Dr. Chappuis's discrimination, he fired her and, upon information and belief, she filed her own EEOC charge.

27. Dr. Chappuis and SCA also deliberately made Ms. Tighe's working conditions intolerable, forcing Ms. Tighe to quit her job.

28. After Dr. Chappuis learned Ms. Tighe was pregnant, his beheavior changed from lustful to hostile. Dr. Chappuis made comments to Ms. Tighe's fellow employees that he hoped the child's father "can afford to pay for that baby," and other comments negatively alluding to the relationship between Ms. Tighe and her child's father.

29. Dr. Chappuis had previously taken adverse employment actions against other female employees who had become pregnant.

9

30. After disclosing her pregnancy, SCA changed what Ms. Tighe was doing on a day-to-day basis from a client-facing role to a far less visible role. Ms. Tighe was moved from her previous position, with possibilities for bonuses and advancement, to another position in a physically isolated part of the office for which she lacked training. This position lacked any possibility for bonuses. Bonuses had been a significant element of Ms. Tighe's compensation.

31. While Ms. Tighe used to have professional flexibility regarding her job hours, post-pregnancy, Dr. Chappuis required Ms. Tighe to be present set hours and chastised and ridiculed her for being even a few minutes "late."

32. SCA's Human Resources director told Ms. Tighe directly that these adverse employment actions were because Dr. Chappuis wanted her gone.

33. Ms. Tighe ultimately was forced to leave her position due to the negative changes in the terms and conditions of her employment.

## Count 2: Battery

34. Dr. Chappuis unlawfully battered Ms. Tighe.

35. On more than one occasion, Dr. Chappuis kissed Ms. Tighe on the back of her neck, which Ms. Tighe never invited or encouraged.

36. On more than one occasion, Dr. Chappuis approached Ms. Tighe from behind while she was working and pressed his erect penis against her. Ms. Tighe never invited or encouraged that behavior.

37. Those occasions of physical touching were offensive and proceeded from rudeness and lust.

38. SCA, its owner (Dr. Chappuis), and its upper management were fully aware of Dr. Chappuis's conduct but took no corrective action. In fact, SCA managers actively encouraged the conduct by telling SCA's female employees that they needed to permit Dr. Chappuis's conduct to "keep him happy." SCA thus ratified this conduct and is liable for Dr. Chappuis's unlawful actions. *Fowler v. Sunrise Carpet Indus.*, 911 F. Supp. 1560, 1585 (N.D. Ga. 1996) (applying Georgia law); *Turner v. Joiner*, 77 Ga. App. 603, 618, 48 S.E.2d 907 (1948).

## Count 3: Sexual Battery

39. Dr. Chappuis committed sexual battery by intentionally making physical contact with Ms. Tighe's buttocks, while he was aroused, without her consent.

40. As shown above, SCA was fully aware of Dr. Chappuis's conduct but took no corrective action. SCA thus ratified that conduct and is liable for Dr. Chappuis's unlawful actions.

### Count 4: Negligent Retention

41. Dr. Chappuis's behavior was a continuous and constant feature of Ms. Tighe's employment. His behavior escalated up until Ms. Tighe left SCA.

42. SCA knew of Dr. Chappuis's reputation for sexual harassment and that it was foreseeable that he would sexually harass Ms. Tighe. Management would joke about how much money he spent on settlements with women he had discriminated against. Nonetheless, he was repeatedly granted the right to behave as he wished and permitted to continue his employment.

43. Dr. Chappuis's behavior was well-known and openly discussed by SCA employees.

44. Dr. Chappuis's behavior was not surreptitious. He threw open tantrums in the workplace if anyone objected to his actions. He created a policy that the women dress in heels and makeup, though their jobs were medical and professional in nature and this attire was not necessary. He made more than one derogatory comment about his employees' personal lives, often in front of other employees.

45. Dr. Chappuis brought prostitutes and strippers onto the property. Other employees were aware of this and frequently discussed and complained about it.

46. SCA knew that Dr. Chappuis was unsuitable for the position because he posed a reasonably foreseeable risk of personal harm to SCA's female employees. SCA knew of Dr. Chappuis's propensity to engage in harassing and discriminatory conduct with SCA's female employees. SCA failed to take any action to protect its female employees or to halt Dr. Chappuis's behavior, and is liable for the harm he caused.

## Count 5: OCGA § 13-6-11

47. Dr. Chappuis and SCA knew that sexually harassing and battering Ms. Tighe was unlawful but did it anyway, which constitutes bad faith within the meaning of OCGA § 13-6-11. As a result, Ms. Tighe is entitled to costs and attorney's fees.

## Count 6: Punitive damages

48. Dr. Chappuis's and SCA's conduct was reprehensible and merits punitive damages to deter future misconduct. Dr. Chappuis not only harassed Ms. Tighe, but also has a history of sexually harassing other female employees, and SCA has a history of enabling and facilitating his misconduct.

49. Ms. Tighe's claim for punitive damages arises from her actual damages.

50. Dr. Chappuis's and SCA's conduct was wanton, willful, and deliberate, and violative of Ms. Tighe's rights and public policy.

51. Dr. Chappuis and SCA acted with the specific intent to cause harm, meriting uncapped punitive damages under Georgia law.

52. Ms. Tighe requests an award of punitive damages, to be determined at trial.

## Prayer for Relief

53. Ms. Tighe respectfully requests the following relief:

    a. Trial by jury;

    b. Compensatory and punitive or exemplary damages in an amount to be determined at trial;

    c. Pre- and post-judgment interest;

    d. Costs and attorney's fees; and

    e. All other appropriate relief.

***

Respectfully submitted this 10th day of June, 2022.

*/s/ Aaron K. Block*
Aaron K. Block
Georgia Bar No. 508192
Andrea Perry Block
Georgia Bar No. 531027
Max Marks
Georgia Bar No. 477397
Allison Bailey
Georgia Bar No. 478434
The Block Firm LLC
404-997-8419
aaron@blockfirmllc.com
andrea@blockfirmllc.com
max.marks@blockfirmllc.com

allison.bailey@blockfirmllc.com

*Counsel for Lindsay Tighe*